## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ANGEL RIVERA,

      Plaintiff,

      v.

ARIANNA DEMPSEY, *et al.*,

      Defendants.

CIVIL ACTION NO. 1:22-cv-00233

(SAPORITO, J.)

## MEMORANDUM

Plaintiff Angel Rivera alleges that four defendants[1] affiliated with SCI-Frackville were deliberately indifferent to his risk of self-injury, leading to an incident in which he swallowed pills and a razor in May 2021. The defendants have moved for summary judgment. (Docs. 74, 78). Because the record plainly contradicts Rivera's claims that the defendants ignored his threats of self-harm and denied him medical care, the defendants' motions will be granted.

### I.   BACKGROUND

In brief, the operative complaint (Doc. 13) alleges as follows: Rivera was an inmate at SCI-Frackville who suffered from "serious mental

---

[1] A fifth defendant, Nathan Wynder, was voluntarily dismissed. *See* (Doc. 56).

illness." Between July 29, 2020, and March 8, 2021, he engaged in "over a dozen incidents of self-harm," including a 56-day hunger strike, self-mutilation, and suicide attempts. On March 8, after spending 17 days in a Psychiatric Observation Cell ("POC") following a suicide attempt, he was considered for potential discharge to the Restricted Housing Unit ("RHU") by nurses Arianna Dempsey and Stephen Donahue. Dempsey allegedly "informed [Rivera] that she was aware of his vulnerabilities to suicide, and self-harm. However, she needed his cell for other inmates." Although Rivera allegedly told Dempsey and Donahue that he "needed serious help" and would "most definitely find a way to kill himself" if released from the POC, Rivera was released to the RHU on March 8, "without any form of official protection from self-harm."

In the following weeks, Rivera filed prison grievances and made a variety of informal complaints to prison staff about his release from the POC and his vulnerability to suicide. These included oral complaints to Shawn Kephart, who allegedly told Rivera that there was "no need for psychiatric observation of any kind," and Robert Boyce, who allegedly told Rivera that he "could not do anything unless [Rivera] actually attempted to kill himself." On May 7, 2021, Rivera "ingested an

[aluminum] razor[] and over two dozen psychotropic pills in an attempt to kill himself."

On April 20, 2023, the Court denied defendant Dempsey's motion to dismiss the claims against her pursuant to Rule 12(b)(6), and it denied her request for summary judgment for Rivera's failure to exhaust administrative remedies. *See* (Docs. 34, 35). The case thus proceeds on Rivera's Eighth Amendment claims of deliberate indifference to a serious medical need and "failure to prevent self-harm" against Dempsey, Donahue, Boyce, and Kephart. The defendants' motions for summary judgment are ripe for adjudication.[2]

## II.  LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a

---

[2] Rivera has also filed a "Motion to Strike/Rebuttal and/or Reply Brief" (Doc. 97), which is in substance an untimely sur-reply filed without leave of court.

reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477

U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.    MATERIAL FACTS

Rivera's response to Dempsey's statement of material facts is styled as an affidavit, *see* (Doc. 89), and cites only sparingly to supporting evidence. Where Rivera has not presented competent evidence to demonstrate a genuine dispute of material fact, the factual assertions in Rivera's affidavit are disregarded[3], and defendants' contrary fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1. Specifically, Rivera disputes much of the content of his medical records, attesting that the records were "fabricated" and that he "does not recall" the events described therein, or that the events never occurred. As further described below, these unsupported attestations are contradicted

---

[3] For example, Rivera's repeated attestations that defendants acted with an "agenda of depriving [him] of treatment" (*see, e.g.*, (Doc. 89 at 8)) are disregarded, because he presents no basis to establish his personal knowledge of the defendants' motivations.

by the record and do not create a genuine issue of material fact. Thus, Rivera's relevant medical records from February 1 through May 7, 2021, are summarized herein. *See* (Doc. 76-5).

### A. Background to POC Discharge (February 1-March 1, 2021)

On February 1, Rivera was being housed in a POC because he had flooded his own cell and "endorsed suicidal ideation." He reported cutting himself daily with plastic spoons due to "stress," and the attending nurse ordered that he not receive cutlery. The nurse found "no clear symptoms that would warrant medication intervention and the risk of medications continues to outweigh any benefit as he has repeatedly hoarded medications and overdosed despite safety measures like crush orders." (Doc. 76-5 at 8).

On February 3, Rivera presented broken pieces of a plastic spoon, which he had used to cut himself, and reported having "rubbed feces into the lacerations on his arm." Nurse Megan Walsh reviewed his medical history, including detailed descriptions of his behavior during the prior five days, and spoke to him at length. Rivera made "multiple comments to staff about ending his life if placed back in the RHU." The psychology department offered him non-medical interventions, but Rivera demanded

medication, which the staff refused based on his prior incidents of hoarding and overdosing. Walsh concluded that Rivera "continues to be self-harming and so will need to remain in POC with no change orders." However, later that day, Rivera requested to see a psychology provider. The provider noted that Rivera wanted to "start [a] step-down plan today, so he can return to [the RHU] on Friday." The following day, Rivera was laughing and joking with staff, reported no "mental health symptoms," and requested reading material. The plan was to "start to try to progress him safely," removing him from "constant" watch to "close" watch, and granting his request for reading material. (*Id.* at 14-21).

On February 5, Rivera's attitude had changed. He told Walsh that he would "never stop" harming himself, and he produced a broken spoon[4] with blood on it. He would remain in the POC, but he would not be prescribed medication because "his behaviors and self-harming are considered part of ASPD diagnosis[5] which does not respond to

---

[4] Walsh noted that, although security had been notified, it was "unclear how [Rivera] continues to access plastic utensils."

[5] The parties dispute Rivera's mental health diagnoses. The prison staff listed his diagnoses as including antisocial personality disorder ("ASPD") and "unspecified insomnia disorder," but that these did not

*(continued on next page)*

medication," and because of his history of hoarding medication, overdosing, and self-harm. (*Id.* at 24-26).

On February 8, Rivera was seen by psychiatrist Dr. Andrew Newton, who described Rivera's case as "challenging from the management point of view." Newton examined Rivera, noting that he presented "no objective clinical signs of psychotic illness," and had been "tried on pharmacotherapy severally in the past with no therapeutic benefit." Ultimately, Newton directed that he should be discharged to a camera cell in the RHU, with a referral to a Behavioral Management Unit. On admission to the RHU, Rivera "presented as respectful, calm, and cooperative," and denied any significant mental health symptoms. (*Id.* at 29-37).

On February 12, Rivera presented without psychological distress, and he was noted to be harassing and mocking staff. Walsh noted that Rivera had not shown any self-harm or psychiatric symptoms since February 8. On February 16, he was still in no apparent distress and

---

constitute a "serious mental illness." Rivera claims that in addition to the listed diagnoses, he "suffered from a serious case of Post Traumatic Stress Disorder," and that his condition should have been classified as serious. *See* (Doc. 89, ¶ 43; Docs. 90-3, 90-4).

reported no symptoms, but continued to "demonstrate[] controlling, immature behavior." However, on February 18, Rivera was again reported to have flooded his cell and "reported to [a lieutenant] that he's going to kill himself." Psychiatry provider Maribeth Bucher wrote: "Inmate is a frequent flyer to the POC and uses it as a coping skill. He has also been known to hoard his medication to overdose so he can be sent out to the hospital for a brief respite from prison." (*Id.* at 52-75).

The following day, Rivera reported to staff in the POC that he had swallowed "a 1/4 inch razor blade," but he "refused" an x-ray. He reported that he had wanted to come to the POC for "quiet," because the RHU was too stressful. Despite his report of swallowing the razor blade, he denied any psychiatric symptoms and did not appear to be in any distress. On February 22, he again denied any psychiatric symptoms, but on February 23, he reported having cut himself and refused treatment from any medical or psychiatric provider. On February 24, he presented in no psychiatric distress. He "report[ed] that he wants certain things (blanket, mattress, water, etc) and essentially that he is behaving badly until he can get them." The providers concluded that his actions were intended to "manipulate and control [his] environment," and not consistent with

psychiatric pathology. On February 25-26, he was verbally abusive to staff and refused evaluation and assessment. (*Id.* at 79-115).

With respect to the medical notes from this period, Rivera attests that he "never spoke to these parties about any of this stuff" or "does not recall any of this." He attests that during this period, he "recalls informing institutional staff on a daily basis that he was suicidal and having suicidal thoughts [non]-stop, and that if discharged to the RHU that he had plans to find a way to kill himself," but "institutional staff refused to document this and report this."

## B. Refusal of Treatment and POC Discharge (March 1-March 8, 2021)

The medical notes document that on March 1, 2021, Rivera was seen by defendant Arianna Dempsey, a psychiatric nurse. Rivera appeared in no psychiatric distress, and he claimed that he "never said I was going to kill myself." He demanded a mattress and blanket that had been refused due to his prior incidents of self-harm: "You have to give me what I ask for. I haven't threatened to hurt myself or engage in self-injury. I know the policy." Aside from these and other demands, he "did not want to engage in any therapeutic conversation": "I don't want programming now. I don't need it. I am cool." Between March 2 and

March 4, he refused a series of attempts by mental health staff to interact with him. On March 4, Walsh noted that he had "expressed to nursing staff that his intention was to remain in the POC until he was transferred to a BMU." Walsh concluded that Rivera was "grossly abusing the POC by refusing assessments in order to extend his POC stay indefinitely." Walsh contacted a "regional medical director to assess for whether Mr. Rivera can be discharged from the POC despite refusing assessment," given that he had four consecutive days without self-harm. Between March 5 and 7, Rivera again refused assessment by the medical staff, and providers were "working on a behavioral plan on how to successfully discharge him from the POC." (*Id.* at 117-141).

On March 8, after a final discussion with Dempsey, Rivera was discharged from the POC to an RHU camera cell for monitoring, with follow-up interactions scheduled to address his "maladaptive behaviors" and anti-social personality disorder. In Rivera's discharge summary, Dempsey recounted Rivera's last 14 days in the POC, including his recent "lack of engaging in any and all offered treatment" and attempts to manipulate staff, and noted that the regional medical chief had approved the discharge. (*Id.* at 154).

Rivera generally disputes these events on the same grounds described above, *i.e.*, that he "does not recall" the events, "never spoke" to the relevant individuals about these topics, and complained daily about his suicidal thoughts to staff who refused to report them.

### C. Treatment After Discharge (March 8-May 6, 2021)

Medical notes indicate that within hours after being discharged, Rivera agreed to be assessed by a psychiatric provider "for the first time since [March 1] when he spoke with [Dempsey]." He indicated that he was "not going back to the RHU," and made "veiled threats" of self-harm: "I already notified my family. Make sure you document this. I told you that I am having these thoughts non-stop." (*Id.* at 157).

Between March 9 and March 22, Rivera vacillated between verbally abusing staff, refusing to interact with staff, and accusing staff of denying him medical treatment. He generally presented without apparent psychological distress. At a contact on March 16, Rivera was "smirking as he asked [Boyce] questions about his stepdown plan . . . [H]is questions were answered previously by other staff. He is well aware of his restrictions, and the treatment rationale." (*Id.* at 159-196).

On March 23 Rivera complained to Boyce about the fact that he was

on a 6-month razor restriction. Boyce responded that he was "not aware of the 6 months, but if he is on one I presume it is due to his extensive history of self-harm," including his previous claim that he had swallowed a razor. Rivera explained that he "hurts himself to make staff angry, or because he is pissed off . . . or to make staff work." Boyce described the following interaction with Rivera:

> I asked him if he ever thought about what he does to his body on a spiritual level. He asked what I meant. I asked him to consider the prospect that he has a moral and ethical obligation to himself, to take care of himself medically, to treat himself with kindness, respect, and dignity . . .

> I told him that despite what he may think or feel sometimes, staff are trying to [help] him and we really do want what is best for him. He asked me if he felt he needed to go to the POC, even though he did not harm himself, could he go. I told him that if he felt like he was a danger to himself or others, or thought he might harm himself, I would want him to ask for POC . . .

(*Id.* at 197).

Over the following days, Rivera continued to complain about his razor restriction. At a meeting on March 30, 2021, Rivera reiterated prior complaints about lack of medication, and made a veiled threat of self-harm to Boyce: "If nursing isn't going to do their jobs . . . I am going to show their incompetence." Rivera "remarked with a smile, that he can't

predict how he will act, what he will say, and what he will do." Boyce pointed out the "contradictions" of that statement, "*i.e.*, [his] deliberate, measured and calculated" attempts to influence staff and affect his cell transfer, to which Rivera "appeared pleased that his efforts were being acknowledged." Boyce's conclusion was that Rivera's "agenda [was] to expedite his transfer and litigate . . . He doesn't appear motivated in treatment." This pattern of accusations, abuse of staff, and demands for various accommodations generally continued through April. (*Id.* at 214-245).

On April 30, Rivera was provisionally accepted into the Behavioral Management Unit as he had requested, and "expressed his thanks for the help that was offered to him," telling one staff member: "I'm done gang warring with you all." On May 3, while on the waiting list for the BMU, he "presented as calm, making jokes, and appeared satisfied that he was leaving." Between May 4 and May 6, he was still awaiting transfer, but was laughing and joking with staff, and denied thoughts of suicide or self-harm. (*Id.* at 246-271).

In response to these records, Rivera attests that he "specifically recalls informing Institutional Staff (All Defendants) on a regular or

when available" of his ongoing suicidal thoughts, and to the extent the medical records document facts to the contrary, he "does not recall these allegations in the slightest."

### D. Self-Harm Incident (May 7, 2021)

At approximately 9:00 a.m. on May 7, 2021, Boyce was summoned to the RHU, where Rivera was reported to be "making statements about possibly getting cell extracted." When Boyce arrived, Rivera complained about staff actions related to yard time, alleged tampering with his mail, and delays in his transfer to the BMU. Rivera told Boyce that he had warned staff "about what would happen if he was sent to the RHU after his last POC discharge, that at some point he can harm himself when and if he chooses to do so." Rivera stated: "You can't stop it . . . [m]y mind was already made up." Rivera then produced a razor blade which was hidden in a sugar packet, "20 or more" pills in his hand, and another four pills on the wicket[6]. Boyce knocked away the four pills, and asked for the remaining contraband, but did not try to reach through the wicket out of concern that Rivera would injure him. Rivera "swallowed the pills and

---

[6] A wicket is a slot in a prison cell door. *See Taylor v. Reinard*, No. 3:CV-12-0891, 2013 WL 4647421, at *1 n.2 (M.D. Pa. Aug. 28, 2013).

the razor blade," and told Boyce that he had already swallowed another 10 pills. He was taken to an emergency room for treatment. (*Id.* at 274). The record does not describe the medical consequences for Rivera, but he attests that he "had to undergo surgery."

## IV.  DISCUSSION

### A. Administrative Remedies

The defendants have requested summary judgment on the basis that Rivera failed to exhaust administrative remedies as required by the Prison Litigation Reform Act. *See* 42 U.S.C. § 1997e(a); *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020). The Court previously addressed this issue and found that Rivera had raised a genuine issue of material fact "as to whether his attempts to exhaust his administrative remedies were thwarted by prison officials." *See* (Doc. 34 at 22-23). Because exhaustion under the PLRA is "non-jurisdictional," and the record forecloses any relief to Rivera on the merits, the Court need not further address these arguments. *See, e.g., Martinez v. Berfield*, No. 1:20-CV-1759, 2024 WL 4311474, at *3 n.6 (M.D. Pa. Sept. 26, 2024) (citing *Rinaldi v. United States*, 904 F.3d 257, 265 (2018)).

### B. Rivera's Affidavits

Rivera's opposition to summary judgment is largely premised on his

own affidavits. *See* (Docs. 89, 90-2, 102-1). Therefore, the Court must consider whether this is competent evidence at the summary judgment stage. It is well-established that "conclusory, self-serving" testimony, via affidavit or deposition, is insufficient to defeat summary judgment. *See Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (citations omitted). However, "the testimony of a litigant will almost always be self serving since few litigants will knowingly volunteer statements that are prejudicial to their case . . . [T]hat has never meant that a litigant's evidence must be categorically rejected by the fact finder." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 321 n. 2 (3d Cir. 2014). When a non-movant attempts to defeat summary judgment through their own testimony, courts consider whether that testimony, "juxtaposed with the other evidence, is sufficient for a rational factfinder to credit [it] despite its self-serving nature." *See Hricenak v. Mickey Truck Bodies*, No. 4:21-CV-00694, 2024 WL 1604650, at *2 (M.D. Pa. Apr. 12, 2024) (citations omitted); *Whitnum v. Meadows at Stroud for Nursing & Rehab., LLC*, No. 3:18-CV-02137, 2020 WL 7773906, at *4 (M.D. Pa. Dec. 30, 2020); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Essentially, Rivera claims in his affidavits that he threatened self-harm or suicide every day, to "all defendants," and that voluminous, detailed records of his actions or statements to the contrary are all "fabricated." Rivera's repeated, vague explanations that he "never spoke to these parties about any of this stuff" in his medical records, or "does not recall" the documented incidents, are unsupported by any other evidence.[7] His claim of daily, unreported threats of self-harm is similarly unsubstantiated, even in his contemporaneous grievances.[8] To the

---

[7] *See Kirleis*, 560 F.3d at 162 (citing *Tinder v. Pinkerton Sec.,* 305 F.3d 728, 731, 736 (7th Cir. 2002) (affiant's bare assertion that she "did not recall" seeing a document did not create a triable issue as to whether she received it)).

[8] Two of Rivera's grievances state, in broad terms, that he told various medical staff he would "find a way to kill [him]self" if released to the RHU. *See* (Doc. 90-8, Doc. 95-1 at 15). Contrary to Rivera's accusations, Dempsey and other staff did acknowledge threats of self-harm in the medical notes, but they concluded that these threats were essentially manipulative. *See, e.g.,* (Doc. 76-5 at 13-15, 154, 157). Thus, the statements in Rivera's grievances do not support his claims that
*(continued on next page)*

contrary, at the time he claims the medical staff was ignoring his threats, Rivera was in fact complaining that he had been "placed in the POC for nearly a month without justification" (Doc. 90-8) and that staff's refusal to give him a razor amounted to unjustified "retaliation." (Doc. 90-5).

In sum, Rivera's affidavits do not establish a genuine dispute of fact as to the symptoms he presented to medical staff or the treatment that he was offered. Therefore, the Court's remaining analysis is directed to whether this treatment, as documented in the record, reflects deliberate indifference by any defendant.

## C. Eighth Amendment

A plaintiff can establish an Eighth Amendment claim by showing that (1) he had a serious medical need; (2) the defendant was deliberately indifferent to that need; and (3) the deliberate indifference caused harm to the plaintiff. *Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023). Deliberate indifference requires "obduracy and wantonness," which may be shown by recklessness or conscious disregard of a serious risk. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (quoting *Whitley v. Albers*,

---

medical notes were "fabricated" or that the defendants refused to document his threats.

475 U.S. 312, 319 (1986)). In the context of suicide or self-harm, a plaintiff can state an Eighth Amendment claim by establishing (1) a "particular vulnerability" to suicide or self-harm; (2) that "the prison official knew or should have known" of that vulnerability; and (3) "the official acted with reckless or deliberate indifference." *Palakovic v. Wetzel*, 854 F.3d 209, 223-24 (3d Cir. 2017).

The essence of Rivera's claim is that his March 8 placement in the RHU constituted deliberate indifference to his risk of suicide or self-harm. However, even accepting Rivera's point that the RHU was "less safe" than the POC, the record forecloses any inference of deliberate indifference. Prior to the March 8 transfer, the staff attempted to treat his mental illness in the POC, but he repeatedly refused or undermined the offers of treatment, and staff were essentially unable to identify a medical cause for his behavior.[9] Based on ample evidence, including

---

[9] The record documents Rivera's treatment for roughly five weeks preceding the transfer, but Rivera further concedes that in the "months leading up to" this incident, he had been placed in POCs "approximately 15 times," and seen "by Psychology staff approximately 35 times, and Psychiatry staff nearly 100 plus times." (Doc. 90 at 4); *see Bucek v. Allegheny Cnty.*, No. 2:22-CV-940-NR, 2025 WL 1826134, at *7 (W.D. Pa. July 2, 2025) ("This extensive and frequent medical treatment—even if wrong—undercuts any showing of deliberate indifference.").

Rivera's own admissions, the staff concluded that he was "grossly abusing the POC by refusing assessments in order to extend his POC stay indefinitely." Thus, Rivera was transferred from the POC to the RHU, having spent the prior week essentially refusing all evaluation and treatment, and not engaging in self-harm. Rivera was released to a cell with a camera where he would be monitored by staff. Even if this decision was erroneous or negligent, a medical professional's reasoned decisions premised on the belief that a patient is malingering do not show deliberate indifference. *See*, *e.g.*, *Todd v. Walters*, 166 F. App'x 590, 592 (3d Cir. 2006); *Grant v. Pennsylvania Dep't of Corr.*, No. 1:20-CV-00338, 2021 WL 4312451, at *9 n.7 (W.D. Pa. Aug. 6, 2021). The fact that medical staff[10] documented and submitted this plan for review by the regional medical director, who approved the plan, further belies any inference of recklessness or "wantonness." *See*, *e.g.*, *Blaise v. Ebbert*, No. 3:12-CV-2298, 2015 WL 1400878, at *7 (M.D. Pa. Mar. 26, 2015); *Dixon v.*

---

[10] The record does not indicate that any defendant aside from Dempsey was directly involved in the March 8 transfer. Rivera's attestations to the contrary are disregarded, because he does not provide a basis for his personal knowledge of any other defendant's "authority" to dictate his transfer. *See* (Doc. 102-1); Fed. R. Civ. P. 56(c)(4).

*Pennsylvania Dep't of Corr.*, No. 3:17-CV-1827, 2022 WL 3330142, at *12 (M.D. Pa. Aug. 11, 2022).

Nor does the record indicate any defendant's deliberate indifference between the March 8 transfer and the May 7 incident of self-harm. Contrary to Rivera's unsupported claims that he threatened self-harm at every available opportunity, he had been refusing treatment and complaining about the restrictions imposed because of his prior self-harm. Nonetheless, he was accepted to a Behavioral Management Unit, as he had requested, and was on the waiting list to be transferred. Boyce's[11] many documented interactions with Rivera indicate patient and exhaustive attempts to help him. When he tried to stop Rivera from self-harm on the day in question, Rivera said: "You can't stop it . . . [m]y mind was already made up." In sum, while the record vividly attests to Rivera's pain and distress, it equally shows that the medical staff consistently tried to help him based on reasoned medical judgments. The events of May 7, 2021, although tragic, did not result from any defendant's violation of Rivera's constitutional rights.

---

[11] While the record shows occasional contacts with Dempsey and Donahue during this period, most of Rivera's documented interactions involved Boyce.

## V.    CONCLUSION

Accordingly, summary judgment will be granted to the defendants.

An appropriate order follows.


Dated: December 1, 2025          *s/Joseph F. Saporito, Jr.*
                                 JOSEPH F. SAPORITO, JR.
                                 United States District Judge